## JOHN G. WHITE *v.* JAMES F. LANGDON.

### *Estoppel.   Principal and agent.*

In order to give the force of an *estoppel in pais*, to the declaration of one, having a claim to property in the possession of another, in regard to such claim, it must appear that the declaration was made with the intent of leading the other party to believe that the claim would not be enforced, and that thereby the other party was led to do, or omit to do, something in regard to the property which has been to his injury.

Whoever deals with an agent, having only a special or limited authority, is bound at his peril to know the extent of the authority.

It is not the duty of a principal, who has given his agent merely a special and and limited authority to sell property, upon learning that the agent has sold it in violation of his authority, to seek the purchaser, and give him notice of his claim; and his omission to do so, and his mere *silence*, are not ordinarily to be construed as a ratification of the sale.

White *v.* Langdon.

The plaintiff sold a horse to M., with a condition that it was to remain the property of the plaintiff till paid for, and agreed that the purchaser might trade off the horse, provided, the pay or avails were paid to the plaintiff. M., after paying a portion of the price, sold the horse to the defendant, without the plaintiff's consent, and took the avails of the sale himself. *Held,* that M. violated his authority as the plaintiff's agent, and that the title to the horse did not pass by the sale to the defendant.

TROVER for a horse. The case was referred, and the referee reported the following facts: The plaintiff, on the 1st of January, 1854, sold the horse in question, at Wells River, to one McLeran, then residing at that place, for one hundred and ten dollars, with the condition that it was to remain the plaintiff's property until paid for. In March, 1854, McLeran paid the plaintiff thirty dollars towards the horse, being the only payment made by him. McLeran took the horse into his possession at the time the contract was made, and used it until the 1st of October, 1854 (previous to which time he had removed to Littleton, New Hampshire), when he exchanged the horse with the defendant, for two other horses. This exchange was made at Littleton, and the defendant then supposed that the horse belonged to McLeran, and did not learn that the plaintiff had any claim to it, until February, 1855.

The plaintiff did not speak to the defendant about his claim to the horse until April, 1855, but at that time he said that he did not want the horse, and that he was in hopes McLeran would pay him the balance due. Shortly after this conversation, McLeran went west, and has not since returned. Soon after his departure, the plaintiff saw the defendant and demanded of him the horse, or the balance due from McLeran.

The plaintiff knew that McLeran had let the defendant have the horse, as early as January, 1855, and he was also aware that during the winter of 1854–5, the defendant was at Wells River depot, where the defendant resided, nearly every day.

When the plaintiff demanded the horse of the defendant, in April, 1855, as above stated, the defendant replied that he ought to have made known his claim to the horse earlier, and that as he had waited so long, and let the defendant winter the horse, and until McLeran had left the country, he had thereby waived his claim, and lost his lien on the horse.

The referee found that the value of the horse, at the time the defendant received it of McLeran, was fifty dollars.

The referee further found, that the plaintiff gave McLeran leave to trade the horse off to any person, provided the pay or avails were paid to the plaintiff; but that it did not appear that the plaintiff ever received from McLeran the horses which he received of the defendant, or the avails of them, nor that he ever requested McLeran to give him these horses, or their avails, or that he ever found any fault with McLeran for making this trade with the defendant.

The county court, at the June Term, 1857,—UNDERWOOD, J., presiding,— rendered judgment on the report, for the defendant. Exceptions by the plaintiff.

*C. C. Dewey,* for the plaintiff.

*A. M. Dickey,* for the defendant.

The opinion of the court was delivered by

ALDIS, J.   This case comes to us upon a referee's report.

I. It is claimed by the defendant, that the plaintiff is estopped from claiming the horse by his declaration to the defendant, in April, 1855, when he notified the defendant of his claim to the horse, "that he did not want the horse, and was in hopes McLeran would pay him up." To give this declaration the force of an estoppel, it should appear that it was made with the intent of leading the defendant to believe that his claim to the horse would not be enforced, and thereby, the defendant has been led to do, or to omit to do, something in regard to the horse that has been to his injury; *Strong* v. *Ellsworth,* 26 Vt. 366.

There is nothing in the facts reported, to lead one to think that the plaintiff intended to have the defendant so believe. On the contrary, it is plain that he intended to have him understand that he had the claim, and might have occasion to enforce it. It was for this purpose that he notified him of his claim. That he did not want the horse, and hoped that McLeran would pay him, was entirely consistent with his insisting on his claim, and was a natural and obvious remark when it appears that his claim was eighty dollars, and the value of the horse but fifty dollars. But it can not fairly be

considered as expressing an intent to relinquish the fifty dollars of value still left for the security of the eighty dollars.

II. The plaintiff gave McLeran leave " to trade off the horse, provided the pay or avails were paid to him, the plaintiff." The fair meaning of this authority is, that he could not trade off the horse, unless the pay or avails came directly to the plaintiff. If they were suffered to go to, or remain in the hands of McLeran, or of anybody else, then the trade was not to be authorized. It was a provision for the security of the plaintiff. The security might become insecure, might fail, if the money or avails were not *paid to him.* It was a special and limited authority which he thus gave McLeran. McLeran was bound to pursue it strictly. It is sufficient, in this connection, to state the principle of the law, that whoever deals with one, having only a special and limited authority, is bound at his peril to know the extent of the authority. If the agent exceeds it, the principal is not bound, and the contract, as to him, is void.

In the application of these general principles of the law of agency, great difficulty arises in determining what is the extent of the special authority, and what powers may be deemed necessary for its execution. The cases are numerous; they proceed upon nice distinctions, applicable to the nature of the authority granted, and the circumstances of each case. We can not at this time review them.

We find that in this case, McLeran clearly violated his authority. He sold the horse about the 1st of October, 1854, and the avails, or pay, were not paid or delivered to the plaintiff. It does not appear that the plaintiff knew of the trade till the following January. The horses, for which McLeran exchanged the plaintiff's horse, did not become the property of the plaintiff. The contract, as to the plaintiff, was void for want of authority. Nor can it be said that the fact found by the referee, " that the plaintiff did not find fault with McLeran, in regard to his trade with the defendant," was a ratification of such trade. He does not appear to have known of the trade, till between three and four months after it was made. McLeran, at the time of the trade, lived at Littleton, New Hampshire. It does not appear from the report, that the plaintiff saw him after the trade was made; and in the absence of such a fact, we can hardly

White *v.* Langdon.

be allowed to conjecture that he must have seen him, and upon such conjecture, raise the presumption of a subsequent ratification. The omission to find fault with him, even if he saw him, may be explained upon grounds, and for reasons, which would not imply any assent to the trade. The report, upon this point, is bare of all those acts and declarations of the party, which are ordinarily to be expected when the trade is ratified after it has been made.

The report states that the plaintiff knew of the sale from McLeran to the defendant, in January; knew that the defendant was at the depot in Wells River (the residence of the plaintiff), nearly every day during the winter, and gave the defendant no notice of his lien on the horse, till April. The defendant claims that the plaintiff, by such omission to give notice and make claim, has thereby ratified the sale of McLeran. We think not. It would be reversing the rule of law. It is the duty of one trading with an agent who has only a limited and special authority, to make inquiry as to the extent of the agent's authority; if he omits inquiry, he does so at his peril. It is not the duty of the principal, upon hearing of the sale by the agent, to seek the purchaser and give him notice of his claim, and his omission to do so, and his mere silence, are not ordinarily to be construed as a ratification of the sale. If special circumstances may be supposed to exist, which would make it the duty of the principal to give such notice, none such are proved in this case.

It seems to us, therefore, that the county court erred in giving judgment for the defendant, and that the plaintiff was entitled to judgment on the report.

Judgment of the county court reversed, and judgment for the plaintiff on the report, for fifty dollars and interest, and costs.